**FILED**

NF
JUN 26 2013
6-26-13
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

AUSA Rajnath Laud (312) 469-6306

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**MAGISTRATE JUDGE VALDEZ**

UNITED STATES OF AMERICA

v.

NICHOLAS KAIGA

**CRIMINAL COMPLAINT**

CASE NUMBER: **13 CR**     **531**

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From on or about November 26, 2010, to on or about February 6, 2012, at Schaumburg, in the Northern District of Illinois, Eastern Division, and elsewhere, NICHOLAS KAIGA, defendant herein:

> willfully and knowingly, did attempt to export, cause to be exported, sell, and supply, directly and indirectly, from the United States, goods, technology, and services, to wit, 7075 T6 aluminum tubing, to a customer located in Malaysia, without obtaining the required approval from the Department of Commerce, Bureau of Industry and Security, in violation of Title 50, United States Code, Section 1705 and Title 15, Code of Federal Regulations, Part 738;

all in violation of Title 50, United States Code, Section 1705(a). I further state that I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
JENNIFER GREEN
Special Agent
DHS, Immigration and Customs Enforcement

Sworn to before me and subscribed in my presence,

June 26, 2013                                              at      Chicago, Illinois
Date                                                                City and State

Maria Valdez, U.S. Magistrate Judge                           Signature of Judicial Officer
Name & Title of Judicial Officer

UNITED STATES DISTRICT COURT )
            )  ss
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Jennifer Green, being duly sworn, state as follows:

1. I have been employed as a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") since September 2011. In connection with my official duties as a Special Agent, I investigate criminal violations of the federal immigration law and criminal violations of the federal laws pertaining to the export of goods, technology, information, and services from the United States, which are regulated by the United States Departments of State, Commerce, and Treasury. I am familiar with federal laws related to such exports and have had advanced training related to such matters.

2. This affidavit is submitted in support of a criminal complaint alleging that NICHOLAS KAIGA has violated Title 50, United States Code, Section 1705(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging KAIGA with violating the International Emergency Economic Powers Act, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable

cause to believe that the defendant committed the offense alleged in the complaint.

3.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts, including undercover recordings of KAIGA and Individual A, undercover email correspondence with KAIGA and Individual A, copies of email correspondence and documents provided by Company A, and documents provided by the Kingdom of Belgium in response to a request pursuant to the Mutual Legal Assistance Treaty between the United States and the Kingdom of Belgium.

4.     As described more fully below, KAIGA and Individual A have willfully violated, and attempted to violate the International Emergency Economic Powers Act, and the regulations promulgated thereunder, by attempting to export 7075 T6 Aluminum Tubing, which is export controlled for nuclear nonproliferation reasons, from the United States to Malaysia, without first obtaining the requisite export license.

5.     In summary and as set forth in more detail below, Individual A, who is located at times in Iran, operates front companies in the United Arab Emirates (UAE) and Malaysia.[1] Individual A first attempted to procure 7075 T6

---

[1]Based on my training and experience, I know that the UAE and Malaysia are strategic transhipment points for global trade. As a result, I also know that the UAE

Aluminum Tubing from a United States company, Company A, purportedly for export to the UAE. Individual A was denied an export license. Later, Individual A purported to sell the 7075 T6 Aluminum Tubing to a company controlled by KAIGA in Belgium. KAIGA instead transshipped the 7075 T6 Aluminum Tubing, through Belgium, to a company controlled by Individual A, NBH Industries, located in Malaysia.[2] Neither KAIGA nor Individual A applied for or obtained a license to export 7075 Aluminum Tubing to Malaysia.

## BACKGROUND

6.    The International Emergency Economic Powers Act (IEEPA), Title 50, United States Code, Sections 1701-1707, grants the President of the United States the authority to deal with unusual or extraordinary threats to the national security, foreign policy, or economy of the United States.

7.    The Export Administration Act of 1979 (EAA), Title 50 Appendix, United States Code, Sections 2401-2420, regulated the export of goods,

---

and Malaysia are countries where individuals procuring goods of U.S. origin on behalf of Iranian end users are known to create and operate front companies as a means of evading trade restrictions imposed on Iran.

[2] The day-to-day operations of NBH Industries are conducted by a virtual office company called Servcorp, located on the 20th floor of a high-rise building in Kuala Lumpur, Malaysia. From my training and experience, I am familiar with the use of virtual office companies by procurement networks. Virtual office companies, such as Servcorp in Malaysia, can serve a legitimate business purpose, but also allow individuals located in another country, such as Iran, to create the illusion that they have a business located in country that is not subject to US embargo restrictions, such as the UAE or Malaysia.

technology, and software from the United States. Pursuant to the provisions of the EAA, the U.S. Department of Commerce promulgated the Export Administration Regulations (EAR), Title 15, Code of Federal Regulations, Parts 730-740, which contain restrictions on the export of goods outside of the United States, consistent with the provisions of the EAA.

8.    Although the EAA lapsed in August 2001, pursuant to his authority under IEEPA, the President issued Executive Order 13222 on August 17, 2001. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the EAA's expiration. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration, the most recent being August 15, 2012. *See* 77 Fed. Reg. 49699 (Aug. 15, 2012).

9.    In general, the EAR applies to goods, technology, and software that are "dual use" in nature, meaning that they have military and non-military applications. For various national security reasons, the EAR prohibits the export of certain goods and commodities to specific countries, absent permission from the U.S. Department of Commerce issued in the form of an export license. The Department of Commerce, Bureau of Industry and Security (BIS) maintains the

4

"Commerce Control List" (CCL), *see* 15 C.F.R. § 774, which consists of general categories of goods that are controlled for export. Individual items within the CCL are identified by an "Export Control Classification Number" (ECCN).

10.     Pursuant to Title 50, United States Code, Section 1705(a) of the IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation promulgated thereunder, including the EAR.

### 7075 T6 ALUMINUM TUBING

11.     As described in more detail below, the material at issue in this complaint is 7075 T6 Aluminum Tubing with an outside diameter of 4.125 inches and an ultimate tensile strength of 572 MPa [megapascals] (7075 Aluminum).[3] Among other applications, 7075 Aluminum is used in the aerospace industry.

12.     According to a Certified License Determination by the BIS, during the time period September 1, 2011, and September 22, 2011:

a.     Aluminum tubing and cylinders with an outside diameter of more than 75 mm (2.95 inches) capable of an ultimate tensile strength of 460 MPa (*i.e.*, the 7075 Aluminum in this matter) were on the Commerce Control

---

[3] 7075 T6 Aluminum is a specification used in the aluminum industry to describe a particular alloy of aluminum. That alloy may take a variety of forms, such as rods, sheets, or tubes.

List (CCL), assigned ECCN 1C202.a, and controlled for Nuclear Nonproliferation (NP1) purposes.[4]

      b.    An export from the United States to Malaysia of Nuclear Nonproliferation (NP1) controlled materials, such as 7075 Aluminum, required a license issued by BIS, with certain exceptions not applicable here. An export from the United States to Belgium of Nuclear Nonproliferation (NP1) controlled materials, such as 7075 Aluminum, did not require a license issued by the BIS.

      13.    Pursuant to Supplement 1 to Title 15, Code of Federal Regulations, Part 738 (Effective Sep. 6, 2011 to Nov. 13, 2011), a license was required to export Nuclear Nonproliferation (NP1) controlled materials from the United States to Malaysia.

## FACTS SUPPORTING PROBABLE CAUSE

### *Individual A's First Attempt to Export 7075 Aluminum*

      14.    On or about September 13, 2007, Individual A submitted a purchase order (PO-1018) to Company A via email for 1,800 feet of 7075 Aluminum. Individual A directed Company A, which is located in Schaumburg, Illinois, to deliver the 7075 Aluminum to a company named Super Alloys LLC in the United Arab Emirates (UAE). The purchase order, PO-1018, was signed using

---

[4] Section 309(c) of the Nuclear Non-Proliferation Act of 1978 requires the BIS to identify items subject to the EAR that could be of significance for nuclear explosive purposes if used for activities other than those authorized at the time of export or reexport.

Individual A's first and last name, and the email was signed with Individual A's first name. Based on this, I believe that the email address from which this email was sent was Individual A's.

15. Previously, on or about September 6, 2007, Company A had received a wire transfer of $30,000 from Super Alloys.[5] On or about September 25, 2007, Individual A contacted Company A by email and requested that a portion of the $30,000 wire transfer be applied toward the purchase of the 7075 Aluminum. This email was signed with Individual A's first name and was sent from Individual A's email address. Company A then began milling the aluminum.

16. On or about November 8, 2007, an employee of Company A contacted Individual A via email, and asked Individual A what the 7075 Aluminum would be used for and who the end-user of the material would be. In the email, the Company A employee stated that "U.S. Export Compliance regulations will require this information on 7075 aluminum."

17. On or about November 19, 2007, Individual A sent an email to Company A stating, "This material [the 7075 Aluminum] is used for oil companies here in UAE and is used for low pressure steam transmission." The email was signed with Individual A's first name, and sent from Individual A's email address.

---

[5] In addition to PO-1018 (for the 7075 Aluminum), Individual A had other orders pending with Company A at the time.

7

18.    On or about November 20, 2007, relying on the information provided by Individual A, Company A applied to the BIS for an export license for the 7075 Aluminum. Attached to the application was a copy of PO-1018. In the application, Company A stated that the end-user and ultimate consignee of the material would be Super Alloys in the UAE. And, Company A listed Super Alloys' address in the UAE as the same address that appeared on PO-1018.

19.    On or about November 27, 2007, in response to Company A's application for an export license, a U.S. Department of Commerce Export Control Officer (ECO) spoke with a Super Alloys representative regarding the 7075 Aluminum's purchase order. The Super Alloys representative told the ECO that Super Alloy's General Manager was in Iran. Shortly thereafter, the ECO made several efforts to contact an officer, director, or manager of Super Alloys, but was unsuccessful. As a result, the ECO traveled to the address listed for Super Alloys in the UAE, who was the purported end user of the aluminum. When the ECO arrived at the address, he discovered that the only company at the address was a company known as Sina Mountain General Trading, which according to the ECO, is an Iranian company.[6]

---

[6] With very limited exceptions, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited without a license.

8

20.    In approximately December 2007, Company A began cooperating with law enforcement.

21.    On or about January 10, 2008, the BIS notified Company A by letter of its intent to deny Company A's export license application.

22.    On or about January 17, 2008, a representative from Company A contacted Individual A by email. In this email, the Company A representative informed Individual A about the status of various orders that Individual A had pending with Company A. With regard to PO-1018, the representative wrote: "This order is still in process at the mill and should be ready mid-March. However, I am having trouble with the export license and I am concerned that it will not be approved. How do you want proceed if the license is not approved? If the license is not approved, I will have to stop mill production and there will be a cancellation charge of $9,641 USD. Please let me know what you would like me to do."

23.    On or about January 18, 2008, a representative from Company A contacted Individual A by email. In this email, the Company A representative informed Individual A that, among other things, "US Export regulations require that all controlled items must be awarded an export license. As I mentioned yesterday, I have concerns that the license may not be approved. If this happens, how would you like me to proceed with this order? If I have to cancel the mill order, then there will be a $9,641.00 USD cancellation charge." In response,

9

Individual A inquired about whether his freight forwarder could apply for the export license. The Company A representative responded that either the freight forwarder or someone else in the United States could apply for the license.

24. On or about January 22, 2008, Individual A sent an email to Company A's representative with instructions to let the mill manufacture the 7075 Aluminum for PO-1018. In the email, Individual A stated, "when gets ready to ship will apply for export license [sic]."

25. On or about February 8, 2008, Company A's representative sent Individual A an email in which he reminded Individual A that the export license for the 7075 Aluminum for PO-1018 was not approved. Attached to this email was a copy of the January 10, 2008, BIS letter notifying Company A of its intent to deny the application for an export license.

26. Also on or about February 8, 2008, in response to a question from Individual A, Company A's representative sent Individual A an email informing him that the 7075 Aluminum for PO-1018 was currently being produced based on Individual A's instructions to do so. Company A's representative also informed Individual A that the 7075 Aluminum required an export license regardless of use.

27. On or about February 12, 2008, the BIS officially denied Company A's application to export the 7075 Aluminum to Super Alloys in the UAE.

### KAIGA and Individual A Export Shipments of U.S.-Origin Goods to Malaysia

28.     In addition to PO-1018 for the 7075 Aluminum, Individual A had other orders pending with Company A. In particular, in or about September 2008, Individual A ordered 300 feet of 4130 Steel Tubing (the "4130 Steel") (PO-1121) and 17,543 pounds of 9310 Steel Bars (the "9310 Steel") (PO-1029), both for shipment to Super Alloys in the UAE. These goods were classified by BIS as EAR99, meaning that the goods were generally unregulated for export, except to embargoed locations such as Iran. Following the ECO's determination that Super Alloys could not be verified as the end user, Company A did not ship these goods to Super Alloys.

29.     On or about November 23, 2009, an undercover agent (UCA), posing as an employee of Company A, contacted Individual A by email, and requested that Individual A contact the UCA regarding Individual A's orders with Company A.

30.     On or about November 26, 2009, Individual A sent the UCA an email instructing that the "ready items" in the possession of Company A be shipped to Individual A's purported customer – Industrial Metals & Commodities SPRL (IMC) – at an address in Brussels, Belgium. Individual A also requested that all of the invoices and shipping documents be issued on behalf of IMC.

31.    According to Google Maps, the address listed for IMC in Brussels, Belgium, is located in a residential neighborhood and appears to be an apartment building. Nowhere at that address do there appear to be facilities suitable for receiving, storing, or processing the 7075 Aluminum or other large shipments of metal alloys.

32.    According to a February 2012 Dun & Bradstreet records search, IMC is a private corporation that was founded in 2009, which has the same registered address in Brussels, Belgium, as the address provided by Individual A for IMC. As of September 2011, Nicholas KAIGA was listed as IMC's Manager.

33.    On or about April 2, 2010, the UCA emailed Individual A asking for contact information for IMC in Belgium to provide to the freight forwarder for the shipment of Individual A's pending orders to IMC. Individual A responded by email that same day, and provided the address and phone number for IMC in Belgium and the contact name, "Mr. Nicholas Kaiga."

34.    On or about June 1, 2010, Company A shipped PO-1121, which consisted of the 4130 Steel, to IMC in Belgium. Like the 7075 Aluminum, the 4130 Steel was originally ordered and paid for by Individual A for shipment to Super Alloys in the UAE.

35.    On or about June 15, 2010, the 4130 Steel arrived in Belgium. According to a bill of lading provided by the Kingdom of Belgium, on or about

July 8, 2010, the 4130 Steel shipped to NBH Industries in Malaysia. The shipper was listed as IMC.

36. According to export documents provided by the Kingdom of Belgium, on or about July 27, 2010, IMC issued an invoice regarding "SA-PO-1121." The "Invoice to:" line of the invoice listed a company in the UAE, Emirates Alloys LLC. The "Deliver to:" line of the invoice listed the virtual NBH Industries office in Malaysia. The invoice was for 138 kilograms of 4130 Steel Tubes. The invoice stated, "Per email acceptance from Mr. [Individual A's first initial and last name] on 6-23-2010."

37. On or about September 10, 2010, the UCA emailed Individual A and informed Individual A that the 9310 Steel (PO-1029) was being prepared for shipment. Individual A responded that day, and once again informed the UCA that KAIGA would be the contact person for the freight forwarder.

38. On or about December 17, 2010, the UCA placed a consensually recorded telephone call to Individual A at a phone number that Individual A had provided to the UCA by email. During this call, Individual A identified himself by his first name. The purpose of this call was to discuss Individual A's orders from Company A, including PO-1018 for the 7075 Aluminum.

39. During this call, Individual A reference a previous order for steel tubes, and indicated that he wished to place another order for the steel tubes. Individual A asked that the UCA ship the order of steel tubes to Belgium. Based

13

on the context, I believe Individual A was referring to shipping the goods to IMC in Belgium.

40.    Also during this call, Individual A asked if the UCA had customers for the aluminum. The UCA informed Individual A that Company A had already paid the mill for the 7075 Aluminum. Individual A informed the UCA that he was "negotiating with Belgium companies that could find some customer for that, if they agree, I can uh, to ship that." Individual A also informed the UCA that the order was placed a long time ago and his customer was supplied "this item" from another company three days before. Individual A also stated that he was trying to find other customers in Europe to sell them "these materials." The UCA asked for the name of the individual in Belgium, and Individual A stated that there were two individuals, one of whose name sounded similar to KAIGA.

41.    On or about January 17, 2011, the UCA emailed Individual A and stated, "Your shipment is at [the freight forwarder] and will be exported today or tomorrow." Individual A responded that day, and stated, "Many thanks."

42.    On or about January 26, 2011, Company A shipped PO-1029, which consisted of the 9310 Steel, to IMC in Belgium. Like the 7075 Aluminum, the 9310 Steel was originally ordered and paid for by Individual A for shipment to Super Alloys in the UAE.

43.    On or about February 14, 2011, the 9310 Steel arrived in Belgium. According to a bill of lading provided by the Kingdom of Belgium, on or about

14

March 11, 2011, the 9310 Steel shipped to NBH Industries in Malaysia. The shipper was listed as IMC.

44.     On or about February 25, 2011, KAIGA emailed an employee of the freight forwarder who shipped the 9310 Steel from the United States to Belgium, authorizing payment and requesting "details for pick up . . . ." The employee responded the same day with the pick up address for the shipping container containing the 9310 Steel.[7]

45.     According to export documents provided by the Kingdom of Belgium, on or about March 3, 2011, IMC attempted to ship the 9310 Steel to NBH in Malaysia. Accompanying the export documents is an invoice issued by IMC on or about March 2, 2011, for 7,985 kilograms of hot rolled steel round bars (gross weight 8,664 kilograms)–the 9310 Steel. The consignee listed on the invoice was NBH Industries in Malaysia. On or about March 3, 2011, an employee of the exporting freight forwarder contacted KAIGA by email and informed him that his shipment had been selected for scanning and physical inspection of the cargo. According to a bill of lading provided by the Kingdom of Belgium, on or about March 11, 2013, IMC successfully shipped the 9310 Steel to NBH in Malaysia.

---

[7] This correspondence was included among the import documents from the freight forwarder provided by the Kingdom of Belgium.

### KAIGA and Individual A Attempt to Export the 7075 Aluminum to Malaysia

46.     On or about June 9, 2011, the UCA placed a recorded telephone call to Individual A to discuss the 7075 Aluminum. During this call, Individual A identified himself by his first name, and told the UCA that he was going to look for a customer for the aluminum.

47.     On or about July 31, 2011, Individual A copied the UCA on an email addressed to imc@industrialmc.com, which stated "the detail for the [Company A] order that we already placed and now we sell[8] to your company. I kindly ask [UCA] to issue all the invoice, shipping documents on behalf of Industrial Metals & Commodities and also kindly use revised invoice to lower your taxes when importing." Pasted in the email was the product specifications for the 7075 Aluminum.

48.     At the bottom of the email described in the paragraph above, an earlier email, signed by Individual B, was quoted. In that email, Individual B requested a copy of the purchase order for the 7075 Aluminum, and advised that it would be better to have the invoice and bill of lading in the name of IMC. Individual B also advised that KAIGA would be contacting the UCA per Individual B's instructions. The email also contained the 7075 Aluminum's

_____

[8] As described below, Individual A did not in fact sell the 7075 Aluminum to IMC, but instead used IMC to tranship the material as a means of evading U.S. export law.

product specifications that appeared on Individual A's original purchase order dated September 13, 2007, except that the total quantity was reduced from 1,800 feet to 1,710 feet.

49.     On or about July 31, 2011, KAIGA,[9] using KAIGA's IMC account, sent the UCA an email, copying Individual A and another IMC account, asking the UCA for the packing details for the PO-1018 purchase order, the exact number of boxes, weight and dimensions. KAIGA also stated that IMC's address should appear on the bill of lading, invoice and packing list.

50.     On or about August 2, 2011, the UCA and Individual A spoke by telephone. During the conversation, the UCA informed Individual A that Company A was going to "need some end-user information" for the "export compliance people," and that the form on which the information would appear was a "BIS-711 form." Individual A agreed to send the form to KAIGA to fill out. The UCA also informed Individual A that "7075 is controlled for export" and asked, "will the product, uh, the 7075 be staying in Belgium?" In response, Individual A stated, "Yes, yes, yes." Later in the call, Individual A asked UCA

---

[9] According to an open source search using WHOIS/Domain Tools for the domain industrialmc.com, the registrant of that web address was Nicholas KAIGA. The registrant's physical address was the same address in Brussels, Belgium, that Individual A had provided to the UCA, as well as the same address as the IMC address listed in the Dun & Bradstreet report. Open source business record searches, including LinkedIn and Pipl, identified KAIGA as being associated with IMC during the time that this transaction took place.

to "send them [IMC] the revised invoice to lower the duty cost . . . duty taxes." UCA asked, "So what do you want me to uh, you want me to undervalue it to what amount?" Individual A respond, "Yeah, uh, I will . . . I will ask you through your private email."[10] Based on my training and experience, individuals involved in the unlawful procurement of U.S.-origin goods commonly seek to undervalue the shipments, as lower-value shipments may receive less scrutiny during the customs process.

51.     On or about August 4, 2011, the UCA sent an email to KAIGA at KAIGA's IMC account regarding the 7075 Aluminum. Attached to the email was a copy of a Form BIS-711, which the UCA requested that KAIGA complete and send back to the UCA so that the aluminum could be crated and shipped to KAIGA. The UCA also advised KAIGA that there were "US export controls attached to that material." The UCA also wrote that shipment would be crated after KAIGA completed the end user statement. The UCA explained that he would provide KAIGA the weights and dimensions of the crates after he received the document.

52.     On or about August 4, 2011, KAIGA sent an e-mail from his IMC e-mail address to UCA with a copy to Individual A and a copy to KAIGA's Yahoo! account. KAIGA requested that the UCA coordinate with KAIGA prior to

---

[10] In an earlier recorded conversation, the UCA had provided Individual A with another email address, purportedly the UCA's personal email address.

confirmation with any freight forwarders related to PO-1018. KAIGA advised the UCA in this email that the UCA could contact him through the KAIGA's Yahoo! account if the UCA needed to reach him after office hours.

53.     On or about August 10, 2011, KAIGA, using KAIGA's IMC account, emailed the UCA a completed Form BIS-711. In the form, KAIGA stated that IMC was both the purchaser and ultimate consignee of the materials. The form also stated that the materials would be re-sold within Belgium, for use or consumption therein, and that the end-use would be "AW-109 commercial helicopter parts." The form was signed and bore the printed name "Nicholas Kaiga." Above the signature blocks was a section entitled "STATEMENT OF ULTIMATE CONSIGNEE AND PURCHASER." This section stated that, by signing the form, the signatories:

> ...certify that all of the facts contained in this statement are true and correct to the best of our knowledge and we do not know of any additional facts which are inconsistent with the above statement. We shall promptly send a supplemental statement to the U.S. Exporter, disclosing any change of facts or intentions set forth in this statement which occurs after the statement has been prepared and forwarded, except as specifically authorized by the...[EAR], or by prior written approval of the...[BIS], we will not reexport, resell, or otherwise dispose of any items approved on a license supported by this statement (1) to any country not approved for export as brought to our attention by means of a bill of lading, commercial invoice, or any other means, or (2) to any person if we know that it will result directly or indirectly, in disposition of the items contrary to the representations made in this statement or contrary to...[EAR].

54.     On or about August 15, 2011, the UCA sent an email to KAIGA at KAIGA's IMC account, with a copy to Individual A. In that email, the UCA

stated that KAIGA needed to complete a new Form BIS-711 because IMC could not be listed on the form as both the purchaser and ultimate consignee if the products were going to be re-sold to a customer of IMC, as that customer would then be the ultimate consignee.

55. On or about August 29, 2011, KAIGA sent a revised Form BIS-711 to the UCA. In the revised form, the ultimate consignee was listed as AEROSPACE INDUSTRIAL METALS & COMMODITIES (AIMC). The address listed on the form for AIMC was the same address as IMC. A search of Dun & Bradstreet revealed no entries for AIMC.

56. On or about September 6, 2011, Individual A sent the UCA an email thanking the UCA for his efforts on behalf of "our" company. Individual A asked the UCA to list IMC as the "sold to" and "shipped to" company on the invoice for the 7075 Aluminum, and instructed the UCA to make the cost $5.90 per foot.[11] The IP address for the location where this email originated was identified as 109.xxx.xxx.xxx. An open source search of this IP adress using WHOIS / Domain Tools IP Lookup indicated that this IP address is registered to an Internet service provider located in Iran.

---

[11] The actual purchase price paid by Individual A for the 7075 Aluminum was $39.67 per foot.

57.     On or about September 13, 2011, KAIGA sent an email from his IMC email address to the UCA with a copy to KAIGA's Yahoo! account asking the UCA for developments on the end-user statement KAIGA sent to him.

58.     On or about October 20, 2011, the UCA placed a telephone call to KAIGA. KAIGA answered the telephone by identifying himself using his first name. During the conversation, the UCA acknowledged receiving KAIGA's previous email regarding the shipment of the 7075 Aluminum. The UCA advised KAIGA that Individual A asked that the UCA prepare an invoice indicating a reduced dollar amount paid for the 7075 Aluminum and that the lowered invoice accompany the shipment. In response, KAIGA stated, "Yeah, I understand. No, that's just for Customs. Normally, it, it helps, uh, you know, because, ah, actually, we are heavily taxed on, uh, Aerospace Materials so that, that also helps and we have to pay that tax, so that, that helps the situation, but I'm, I'm, I'm aware about that so that's, that's no problem." KAIGA asked that the UCA send him the real invoice and the one that was lowered. KAIGA also stated that he would review all the documents.

59.     On or about October 21, 2011, the UCA sent KAIGA an email at KAIGA's IMC account, copying Individual A, and advising that the shipment was ready to be picked up by KAIGA's freight forwarder. Attached to the email were two invoices: one was the original invoice listing Super Alloys in the UAE in the "sold to" line and the actual price of the aluminum tubing. The other

21

invoice listed IMC in the "sold to" line and the total price was reduced from $67,835.70 to $10,089.00, as Individual A had requested. Unbeknownst to KAIGA or Individual A, the shipment ready to be picked up was actually a different kind of aluminum – 6061 Aluminum, not 7075 Aluminum – that was not a 1C202 controlled commodity, and therefore not controlled for export to Malaysia.

60.     On or about October 21, 2011, Individual A sent the UCA an email stating "Please kindly use only IMC invoice for shipping. Thanks, [Individual A's first name]." The IP address for the location of where this email originated from was 109.xxx.xxx.xxx. An open source search of this IP address using WHOIS / Domain Tools IP Lookup indicated that this IP address is registered to an Internet service provider located in Iran.

61.     On or about November 14, 2011, the sham 7075 Aluminum shipment was picked up from Company A in Schaumburg, in the Northern District of Illinois, by a freight forwarding company designated by IMC. The Shipper's Letter of Instruction that accompanied the shipment identified the material's ECCN number as 1C202 and indicated, "These commodities licensed by the U.S. for ultimate destination. Diversion contrary to U.S. law prohibited."

62.     On or about November 22, 2011, a Shipper's Export Declaration was filed by the freight forwarder company with the U.S. Census Bureau indicating that they were exporting materials with a total value of $10,089.00 from the

22

United States to IMC in Brussels, Belgium, via ocean vessel. In my training and experience, shippers rely on the invoices and other documents accompanying the shipment when filing Shipper's Export Declarations.

63. On or about November 22, 2011, Shipping Line A issued a bill of lading for the sham 7075 Aluminum shipment that listed the ultimate consignee of the shipment as IMC. KAIGA was listed as IMC's point of contact. The bill of lading specifically stated that "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. Law Prohibited."[12]

64. According to shipping documents provided by a Belgian Customs Official, on or about December 1, 2011, the shipment containing the sham 7075 Aluminum (PO-1018) was delivered to the Belgian port of Antwerp.

65. According to an invoice accompanying the subsequent shipment to Malaysia, on or about December 2, 2011, IMC issued an invoice showing IMC as the seller and NBH Industries as the buyer of the sham 7075 Aluminum.

66. On or about February 1, 2012, the sham 7075 Aluminum was placed in a container and transported from Antwerp to the Belgian port of Zeebrugge, where it was scheduled to be loaded on a ship by a freight forwarding company and shipped to Malaysia.

---

[12] Based on my training and experience, in the shipping industry, the bill of lading is customarily sent to consignee of the shipment.

23

67. On or about February 7, 2012, the sham 7075 Aluminum was exported from Belgium. The bill of lading for this shipment identified the shipper as IMC and the consignee as NBH Industries, located in Kuala Lumpur, Malaysia.

68. According to the Companies Commission of Malaysia, corporate records filed by NBH Industries in Malaysia indicate that it is a private limited company with 500,000 ordinary shares that was first registered in 2008. The corporate filing shows that the primary shareholder is an individual with a name that is very similar to that of Individual A, and who held 350,000 shares.

69. On or about August 30, 2012, a Commerce Department ECO conducted a post-shipment verification of an unrelated shipment to NBH Industries in Kuala Lumpur, Malaysia. The ECO contacted the telephone number listed by NBH Industries on the BIS-711 form associated with that shipment. The phone was answered by an employee of Servcorp, a provider of virtual office services located at Level 20, Menara Standard Charter Bank, Jalan Bukit Bintang, Kuala Lumpur, Malaysia. The employee stated that the managing director of NBH Industries was Individual A, but that he was unavailable to meet as he is based in Iran.

70. On or about September 9, 2012, the ECO met with the office manager for Servcorp. The manager stated that she handled the NBH Industries account for Individual A, who is located in Iran. The officer manager stated that

24

NBH Industries is a trading company, but that she did not know who the ultimate end-users of the materials are or where they are located.

71.     On February 27, 2012, BIS verified that at no time did Individual A, KAIGA, or any of the entities and individuals associated with Individual A and KAIGA receive or possess a license from the U.S. Department of Commerce to export the 7075 Aluminum from the United States to Malaysia.

### Individual A and KAIGA Discover that the 7075 Aluminum Was Sham

72.     On or about October 14, 2012, KAIGA left a voice message for the UCA. In the message, KAIGA stated, "Hello [UCA], this is uh, Nicholas speaking." KAIGA also stated that he was calling about "[Individual A's] shipment." KAIGA continued, "I presume uh, your guys sent the wrong uhm, the wrong product to me, which is uh, should be arriving here any minute. But uh, just kindly give me a call . . . ."

73.     On or about October 16, 2012, the UCA called KAIGA. During the conversation, the UCA asked about the 7075 Aluminum. Specifically, the UCA asked, "[H]ow was it determined that it's not the right stuff?" KAIGA responded, "Actually it's uhm, this is what uh, this information I got from ...[Individual A]. He's the one who told me that uh, that was the wrong [product] . . . based on the uhm, information you sent. I think the techs reports and what that was confirmed was shipped. If I may ask, I'm sorry I was this uhm, has this product

already been shipped?" The UCA responded, "That's the stuff that we shipped to you." KAIGA then asked, "[F]rom which port did you ship it to?" The UCA responded, "Well, it went to you in Belgium." Later, the UCA stated, "That's the stuff that we shipped to you earlier in the year." KAIGA asked, "Okay, the 70...70?" The UCA stated, "That's the stuff that I thought it was for you." KAIGA said "Yeah absolutely. We we cleared everything. We, we, we, we, we purchased it, but uh, you know, this is uh, you know, something that . . . ." The UCA stated, "But then you sent it on to...[Individual A]." KAIGA stated, "Yeah exactly."

74.     On or about October 22, 2012, the UCA placed a telephone call to Individual A. During the call, Individual A stated that the material received was "6061" rather than "7075."[13] Individual A also stated, "[T]he shipped material is, uh, twelve feet."[14] Later in the call, the UCA asked, "But are you sure are, but are you sure? Are you absolutely sure?" Individual A said, "Yes, yes that's sure. I can ask them to supply one picture of the material."

75.     On or about November 6, 2012, Individual A sent the UCA an email in which Individual A wrote, "Dear [UCA], I am sending you some photos for the wrongly shipped materials." Attached to the email was a photograph of an open

---

[13] As discussed in above, the sham 7075 Aluminum shipped to KAIGA was in fact 6061 Aluminum.

[14] The sham material shipped to Individual A was in fact twelve feet in length, while his order called for tubing that was 15 feet in length.

crate containing what appears to be the sham 7075 Aluminum that Company A shipped to KAIGA. The photographs depict the Company A shipping label, including the purchase order number PO-1018. The IP address for the location where this email originated was identified as 109.xxx.xxx.xxx. An open source search of IP address 109.xxx.xxx.xxx using WHOIS / Domain Tools IP Lookup indicated that this IP address is registered to an Internet service provider located in Iran.

### KAIGA's Arrival in the United States

76.     On or about June 17, 2013, KAIGA entered the United States through JFK Airport in New York. During a secondary examination by U.S. Customs and Border Protection, KAIGA stated that he attended high school in Belgium and that he currently worked for Industrial Metals and Commodities in the United Kingdom. KAIGA stated that his email address was KAIGA's Yahoo! email address.

77.     On or about June 19, 2013, KAIGA and the UCA met at a restaurant in New York. Law enforcement agents who were conducting surveillance of the undercover meeting positively identified KAIGA as the same individual who was present and examined by Customs and Border Protection. Further, during the undercover meeting, KAIGA told the UCA words to the effect of, he "had a little

situation at the airport" and that he was "detained by CBP." KAIGA told the UCA that it was "due to the nature of [his] business."

78.   During the consensually recorded meeting, the UCA, who was familiar with KAIGA's voice from undercover telephone conversations made during the course of the investigation, recognized KAIGA's voice as the same voice as the individual with whom he spoke via telephone on approximately ten occasions.

79.   During the consensually recorded undercover meeting, KAIGA and the UCA discussed a variety of topics, including, but not limited to, Individual A, past business transactions, evading export control laws, trust and the need to share information, the shipment of the purported 7075 Aluminum, future business dealings, including KAIGA's contacts in Iran and the prospect of doing business in Iran.

80.   During the consensually recorded undercover meeting, KAIGA and the UCA discussed evading export control laws, in part, as follows[15]:

KAIGA:    We've had a lot of [export] controls lately, but we always able to, uh, you know ship things through without any problem.

UCA:      You mean get around the controls?

---

[15] Language that is quoted from the recorded conversations throughout this Affidavit is based upon preliminary reviews of the recorded conversation. Quoted material is not intended to be a final transcription of the audio recording from which the quotes are taken.

KAIGA:      Get around the controls.

UCA:        How do you get around the controls?

KAIGA:      We know people inside and I am working now with a freight company.

81.     During the consensually recorded undercover meeting, KAIGA and the UCA discussed the shipment of the purported 7075 Aluminum. The UCA confronted KAIGA concerning his understanding that the 7075 Aluminum was ultimately destined for Individual A. The following is an excerpt from the conversation:

UCA:        What I'm saying to you is, [Individual A] told me he sold it to you.

KAIGA:      Uh huh.

UCA:        All, all I'm saying to you is to let me work with you on this stuff.

KAIGA:      Absolutely. But he didn't sell it to me. He didn't sell it to me (UI).

UCA:        Right, he wanted me to ship it to you for him.

KAIGA:      He wanted you to ship it to me [KAIGA] for him [Individual A].

UCA:        Right...

82.     During the consensually recorded undercover meeting, KAIGA further told the UCA that the 7075 Aluminum was always intended for Individual A in Malaysia. The conversation was, in part, as follows:

KAIGA:     I'll let you in on anything and uh...

UCA:       Because if you let me in, like you didn't, with the [7075 Aluminum]...I can help you. This is what I'm saying. If you say to me, hey look, this is for [Individual A], so, like the 7075, if you would have told me up front, I could helped you. You know what I mean? You didn't tell me. You said it was for Belgium. It was for [Individual A]. I could've helped you. It's okay.

KAIGA:     It was for [Individual A].

UCA:       I know.

KAIGA:     But I didn't mean to (UI)

UCA:       He wanted you to give me some bullshit. Right? Yes?

KAIGA:     No, not really.

UCA:       Sort of.

KAIGA:     He never said that.

UCA:       He [Individual A] wanted you to handle that, right?

KAIGA:     He wanted me to handle that.

UCA:       But it was for him all along?

KAIGA:     It was for him all along.

UCA:       In Malaysia?

KAIGA:     Yeah.

83.   Later in the consensually recorded undercover meeting, there was

additional conversation concerning the 7075 Aluminum being for Individual A and that it was originally intended for Malaysia. This portion of the conversation was, in part, as follows:

| | |
|---|---|
| UCA: | Where was he [Individual A] sending them? |
| KAIGA: | I have no idea. |
| UCA: | But it went to where? Malaysia, right? |
| KAIGA: | It, it was originally for Malaysia. |
| UCA: | It was for Malaysia? |
| KAIGA: | It was for Malaysia. |

*Conclusion*

84.     Based on the foregoing, I believe that KAIGA willfully attempted to circumvent U.S. export law by exporting the 7075 Aluminum from the United States to Malaysia without the required license, in violation of Title 50, United States Code, Section 1705(a).

FURTHER AFFIANT SAYETH NOT.

Jennifer Green
Special Agent
DHS, Immigration and
Customs Enforcement

Subscribed and sworn
before me this 26th day of June, 2013

Honorable Maria Valdez
United States Magistrate Judge